**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOHN GOODMAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-1321-G(BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned

United States Magistrate Judge for proposed findings of fact and recommendation for disposition.

Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 19, 2011 (doc. 17)

and *Defendant's Motion for Summary Judgment*, filed October 19, 2011 (doc. 18).  Based on the

relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**, Defendant's

motion should be **GRANTED**, and the final decision of the Commissioner should be wholly

**AFFIRMED**.

## I.  BACKGROUND[1]

**A.**     **Procedural History**

John Goodman (Plaintiff) seeks judicial review of a final decision by the Commissioner of

Social Security (Commissioner) denying his claims for disability benefits and supplemental security

---

[1]  The background information comes from the transcript of the administrative proceedings, which is
designated as "R."

income under Title II and XVI of the Social Security Act.  (R. at 17-19.)  Plaintiff applied for disability insurance benefits and supplemental income benefits on February 11, 2009, alleging disability beginning January 20, 2009.  (R. at 20.)  Specifically, he alleged disability due to several impairments, including affective/mood disorder, a hernia, left ankle problems, hypertension, neck and back problems, depression, and sleep apnea.  (R. at 20, 22, 97.)  His application was denied initially and upon reconsideration.   (R. at 20.)   He timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on August 26, 2010.  (*Id.*)  On September 14, 2010, the ALJ issued his decision finding Plaintiff not disabled. (R. at 20-34.)  The Appeals Council denied Plaintiff's request for review on May 24, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 5-7.)  He timely appealed to the United States District Court pursuant to 42 U.S.C. § 405(g).  (doc. 17.)

## B.      Factual History

### 1.      Age, Education, and Work Experience

Plaintiff was born on February 27, 1962.  (R. at 32.)  At the time of the hearing before the ALJ, he was 48 years old.  (R. at 56.)   He completed the eleventh grade, earned a General Equivalency Degree, and did not attend vocational school or college.  (R. at 56, 289.)  His past relevant work experience includes employment as a construction worker, air conditioner installer and servicer, and an automobile salesman.  (R. at 32, 289.)

### 2.      Medical, Psychological, and Psychiatric Evidence

Plaintiff had a history of pain in his left ankle prior to his alleged disability onset date of January 20, 2009.  (R. at 24, 223.)  An evaluation and x-rays performed in October 2005 showed that he had soft tissue swelling and soft tissue calcifications adjacent to his distal tibia and fibula.  (R.

at 24, 223.)   On January 16, 2009, he presented at the Harris Methodist Southwest Hospital emergency room complaining of abdominal bulging and pain, and was diagnosed with a hernia at the periumbilical area.  (R. at 340.)

On February 11, 2009, Plaintiff's vehicle was struck from behind while he was stopped at a light.  (R. at 363.)  On February 19, 2009, he arrived at the Harris Methodist Southwest Hospital emergency room complaining of back pain that was "not getting any better" since the accident.  (R. at 281.)  X-rays revealed he had a slight degenerative lipping of the end plates, but he had good alignment and "no fracture."  (R. at 285.)  The examining physician diagnosed Plaintiff with lumbar sprain and strain, prescribed him Flexeril for his muscle spasms and Hydrocodone for his pain, and discharged him with instructions to follow-up in 2 days.  (R. at 286.)

On February 23, 2009, Plaintiff sought treatment from Farid Aminzadeh, D.C., a chiropractor, because his back and neck pain had worsened since the accident.  (R. at 363.)  X-rays and orthopedic tests revealed that he had joint restriction and capsular swelling throughout the thoracic and lumbar spine.  (R. at 365.)  Other tests showed that his sensation was intact, he had normal muscle tone, and the range of motion of his upper and lower extremities appeared to be symmetrical and within normal limits for his age.  (*Id.*)  Dr. Aminzadeh opined that Plaintiff had traumatic injury to the cervical, thoracic, and lumbar spine, which caused him joint stiffness, muscle spasms, lower back pain, and segmental dysfunction.  (R. at 366.)  His prognosis was fair, but he would likely experience pain and a decreased range of motion during stressful periods, and he was advised to seek treatment for pain management.  (R. at 367.)

From March 4 to March 19,2009, Dr. Aminzadeh performed additional evaluations.  (R. at 371-81.)  On March 19, he noted Plaintiff's back pain and overall symptoms of severity at levels of

"0," and released Plaintiff from his care.  (R. at 372.)  An MRI performed on Plaintiff on February 25, 2010 showed Plaintiff's lumbar vertebra to be within normal configuration and well aligned. (R. at 449.)  While Plaintiff's spine appeared to be otherwise normal, the impression showed a one millimeter disc bulge at L1-2, a one millimeter disc bulge at L5-S1, and a two millimeter disc bulge at L4-5 with resultant attenuation of the ventral subarachnoid space and mild narrowing of the left neural foramen.  (*Id.*)

In June 2009, Plaintiff was diagnosed with obstructive sleep apnea.  (R. at 229.)  On July 1, 2009, after undergoing an evaluation by a pulmonologist and beginning treatment for his obstructive sleep apnea, Plaintiff underwent surgery to repair his incisional hernia.  (R. at 340-42.)  After the surgery, Dr. Annette Marie Elbert, Plaintiff's surgeon, noted that his pain was under control but advised him not to return to work and not to lift more than 20 pounds for six weeks following the operation.  (R. at 343-44.)

On June 6, 2009, Bobbie Hart Lilly, Ph. D., completed a mental examination.  (R. at 288-92.) Dr. Lilly noted that rapport with Plaintiff was "not easily established but gradually improved over the course of the interview."  (R. at 288.)   She opined that he had severe symptoms of depression and hopelessness and moderate symptoms of anxiety.  (R. at 290.)  Plaintiff had a severe impairment in abstract thinking and mild impairments with his memory, insight, and judgment, but his attention and concentration were intact.  (R. at 291.)  She diagnosed him with "mood disorder due to chronic pain with depressive features" and recommended psychiatric treatment "for close monitoring of his suicidal and homicidal ideations and thought perceptions."  (R. at 292.) She noted that it was questionable whether he possessed "sufficient personal motivation and insight to make progress possible."  (*Id.*)

On July 23, 2009, Margaret Meyer, M.D., a state agency medical consultant, completed a mental RFC assessment and a Psychiatric Review Technique by reviewing Plaintiff's medical records.  (R. at 298-313.)   After finding that Plaintiff was "not significantly limited" in nine categories and was "moderately limited" in eleven categories, Dr. Meyer opined that he was "able to understand, remember, and carry out detailed but non-complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, accept instructions and respond to changes in a work settings [*sic*]," and that the "[a]lleged severity of [his] limitations [was] not supported" by the evidence of record.  (R. at 298.)

On April 9, 2010, Plaintiff presented to H.O.P.E. Medical and Dental Clinic, where Dr. White diagnosed him with bipolar disorder and referred him to Pecan Valley MHMR.  (R. at 439, 452.)  On June 8, 2010, Harvey Brooks, a clinician at MHMR conducted an evaluation of Plaintiff. (R. at 32, 433.)  Plaintiff reported having mood swings, anger issues, being easily irritable, and having "road rage."  (R. at 434.)   He denied receiving psychiatric treatment in the past, ever attempting suicide or homicide, and having any "suicidal/homicidal ideations at [that] time."  (*Id.*) Plaintiff stated that he became so angry at times that he hurt himself.  (*Id.*)  Mr. Brooks found that Plaintiff's anger was "not [a] constant issue" and that he showed "no [signs of] self mutilation" (*Id.*) He assigned Plaintiff a GAF score of "42" and diagnosed him with bipolar/manic disorder and intermittent explosive disorder. (R. at 433, 435.)

On July 14, 2010, Plaintiff returned to MHMR accompanied by his wife, who reported that "she [was] worried about [Plaintiff] and his out of control behavior."  (R. at 419.)  She stated that he had threatened to hit and kill her on the way to the appointment, and she "just jumped out of their vehicle ... because ... she felt he would if she would have stayed in the car."  (*Id.*)

On July 29, 2010, Ms. Selena Summer, a clinician at MHMR, concluded that Plaintiff had "made no progress on his treatment plan" and recommended additional weekly sessions. (R. at 416.) On August 9, 2010, Ms. Summer conducted another therapy session with Plaintiff. (R. at 415.) He reported that his wife was divorcing him, he continued to have racing thoughts, and it had a "bad week" for destroying things, as he had destroyed a lawn mower and part of his barn. (*Id.*)

On August 10, 2010, Arunachalam Thiruvengadam, M.D., Plaintiff's treating psychiatrist at MHMR, completed an Initial Evaluation and a Mental RFC assessment. (R. at 407-14, 442-47.) During the evaluation, Dr. Thiruvengadam noted that Plaintiff was pleasant, calm, and cooperative. (R. at 409.) His affect was "manic," but his thoughts were logical, clear, abstract, concrete, and goal-oriented. (*Id.*) He diagnosed Plaintiff with bipolar and intermittent explosive disorders. (R. at 410.) In his RFC assessment, he assigned Plaintiff a GAF score of 35 and noted that his overall prognosis was "poor." (R. at 442.) He opined that Plaintiff was unable to meet competitive standards for unskilled work in areas such as, understanding, remembering, and carrying out very short and simple instructions, and that he had no useful ability to remember work-like procedures. (R. at 444.) He further determined that Plaintiff had "no useful ability to function" in six areas, including, the ability to understand, remember, and carry out detailed instructions and the ability to interact appropriately with the general public and maintain socially appropriate behavior. (R. at 445.) Additionally, he found Plaintiff to have extreme restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id.*) He concluded that Plaintiff's mental impairments would cause him to miss more than four days of work per month, and that it could be expected to last for more than twelve months. (R. at 447.)

3.      **Hearing Testimony**

On August 26, 2010, Plaintiff and a vocational expert testified at a hearing before the ALJ. (R. at 20.)  Plaintiff was represented by an attorney.  (*Id.*)

a. *Plaintiff's Testimony*

Plaintiff testified that he was 48 years old, married, had not completed high school, and lived with his wife and his two children, ages 19 and 21.  (R. at 56, 61.)  His last job had been as a car salesman and had lasted over three years.  (R. at 77.)  Before that, he worked primarily in construction, but he was also as an air conditioner installer and servicer for a couple of years.  (R. at 78.)  Plaintiff terminated his employment in car sales because he experienced anger and frustration around people and had difficulty completing the required paperwork.  (R. at 79.) Additionally, the long shifts at the car dealership exacerbated the pain in his feet, ankles, knee, and lower back.  (R. at 78-79.)

Plaintiff further testified that the pain in his knee was caused by meniscus tears, missing cartilage, and fluid build-up under his knee-cap.  (R. at 80-81.)  He also stated that the pain in his ankle was accompanied by constant swelling, and that he had pain-causing arthritis in his left shoulder.  (R. at 80-81.)  He experienced daily migraines that sometimes lasted up to four hours. (R. at 82.)  These migraines exacerbated his anger, which in turn caused him to destroy objects around him and make him isolate himself from noise and people.  (R. at 82-83.)  Plaintiff's wife had to leave the house during his anger outbursts to avoid confrontations.  (*Id.*)

Plaintiff drove just a few times per month to take his family to the store but chose wait outside for them while they shopped.  (R. at 83-84.)  He was unable to bathe and could take only short showers to avoid standing for too long.  (R. at 84.)  Plaintiff's joint and muscle pain prevented

him from exercising and performing even simple household chores, such as washing dishes and doing laundry. (*Id.*) In response to a question by the ALJ, he stated that he could not work as a night-time security guard because he would be unable to focus due to his physical pain and constant anger. (R. at 87.) Plaintiff testified that he enjoyed and took great pride working for himself in the construction industry. (R. at 89.)

### b. *Vocational Expert testimony*

Todd Harden, a vocational expert (VE), also testified at the hearing. (R. at 52, 90-94). The VE testified that Plaintiff's past work history included jobs as a construction worker (heavy, SVP-4), air conditioning installer/servicer (medium, SVP-7), and a car salesperson (light, SVP-6). (R. at 91.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work with the following limitations: the ability to perform light work, occasionally lift 20 pounds; frequently lift 10 pounds; the ability to stand and walk for only two hours out of the eight-hour workday; and occasional or incidental contact with the public and co-workers. (R. at 92.) The VE testified that the hypothetical person could not perform any of Plaintiff's past relevant work because of the two-hour limitation on standing and walking. (*Id.*) He testified that the hypothetical person could perform other work such as a bench assembler (light, SVP-2), with 2,500 jobs in Texas and 50,000 jobs in the national economy; an injection molding machine tender (light, SVP-2), with 2,000 jobs in Texas and 20,000 jobs in the national economy; and a small products assembler II (light, SVP-2), with 2,000 jobs in Texas and 25,000 jobs in the national economy. (R. at 92-93.)

## C. <u>ALJ's Findings</u>

The ALJ issued his decision denying benefits on September 14, 2010. (R. at 20-34). At step

one, the ALJ found that Plaintiff met the insured status requirements through March 31, 2012, and

had not engaged in substantial gainful activity since his alleged onset date of January 20, 2009.  (R.

at 22.)  At step two, he found that Plaintiff had the following severe impairments: degenerative joint

disease of the right knee; degenerative disc disease of the lumbar spine; hypertension with left

ventricular hypertrophy, chest pain, and left arm numbness; abdominal pain with history of

incisional hernia repair; obstructive sleep apnea; obesity; mood disorder with depressive features;

and bipolar disorder.  (*Id.*)  Despite those impairments, at step three, he found that no impairment

or combination of impairments satisfied the criteria of any impairment listed in the social security

regulations.   (*Id.*)

Next, the ALJ determined that Plaintiff had the Residual Functional Capacity (RFC) to

perform light work with the following limitations: he could not stand or walk for more than 2 hours

in an 8-hour workday, could perform only simple job tasks, and would be restricted to occasional

contact with the public and incidental interaction with co-workers.  (R. at 28.)  In assessing

Plaintiff's RFC, the ALJ first concluded that Plaintiff's physical and mental impairments could

reasonably be expected to produce his pain and symptoms, but noted that his statements about his

symptoms were credible only to the extent supported by the RFC assessments performed by medical

consultants, Margaret Meyer, M.D.  and Laurence Ligon, M.D.  (R. at 31, 296-99, 314-21.)[2]  For

---

[2] The ALJ apparently incorporated the state agency consultants' RFC assessments into her own RFC
determination, citing Dr. Meyer's mental RFC that Plaintiff was "not significantly limited" in nine categories and
was "moderately limited" in eleven categories.  (R. at 296-99).  Dr. Meyers had determined that he was "able to
understand, remember, and carry out detailed but non-complex instructions, make important decisions, attend and
concentrate for extended periods, interact with others, accept instructions and respond to changes in a work settings
[*sic*]," and that the "[a]lleged severity of [his] limitations [was] not supported" by the evidence of record.  (R. 298.)
The ALJ also cited the physical RFC of Dr. Ligon that Plaintiff had no postural, manipulative, visual,
communicative, or environmental limitations; and could occasionally lift and carry 20 pounds; frequently lift and
carry 10 pounds; stand,  walk, and sit for 6 of 8 hours; and had unlimited pushing and pulling ability.  (R. at 314-21.)

instance, while he acknowledged that Plaintiff complained of having daily migraines with a lot of dizziness, he noted that this may be a side-effect of his medications. (R. at 30.) He further noted that although Plaintiff was diagnosed with bipolar disorder and "anger issues" and was prescribed medication for those impairments, these problems appeared not to have arisen until May 2010, which was the earliest complaint he could find in the record. (R. at 31.) He concluded that because Plaintiff was motivated to continue with his psychological treatment, his mental impairments would improve and would not continue at their current level for 12 months or longer. (*Id.*). With respect to the sleep apnea and mood disorder due to chronic pain, he concluded that Plaintiff's "alleged severity of his limitation[s] was not supported by the evidence of record." (R. at 31.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform his past relevant work. (R. at 32.) At step five, he determined that considering Plaintiff's age, education, work experience, and RFC, Plaintiff had the ability to perform other work existing in significant numbers in the national economy. (*Id.*) Accordingly, the ALJ determined that Plaintiff was not disabled at any time between his alleged onset date of January 20, 2009, and the date of the ALJ's decision. (R. at 33.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. 42 U.S.C. § 405(g), 1383(C)(3); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is defined as more

than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)).   Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step

review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents the following issues for review:

(1)     Unless the correct severity standard is used by the ALJ in the disability evaluation, the claim must be remanded to the Commissioner for reconsideration. The ALJ failed to cite to the appropriate precedent, a case to the same effect, or state the severity standard as adopted by the Fifth Circuit.  Did the ALJ create legal error requiring remand?

(2)     Treating source opinions are to be given great weight in determining disability. Did the ALJ err by only referencing the evidence supporting his decision, and by failing to address Dr. Daniel's [sic] treating opinion under the six factor analysis found in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)?

(Pl. Br. at 1.)

**C.**     **Severity Standard**

Plaintiff first contends that remand is required because the ALJ erred by failing to apply the correct severity standard at step 2 of the disability analysis.  (Pl. Br. at 9-10.)

**1.**     ***Stone* Standard**

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Finding that a literal application of these regulations would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985).  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."

- 13 -

*Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(C) (1984) is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle, Mag.). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, the ALJ did not cite *Stone*. He stated that "an impairment or combination of impairments is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 21) (citing 20 C.F.R. § 404.1520(c)). He further stated that "an impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. at 21) (citing 20 C.F.R. §§ 404.1521 and 416.921 and Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p). These statements are inconsistent with the *Stone* holding that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." 752 F.2d at 1104-05. *Stone* provides no allowance for a minimal interference on a claimant's ability to work, and it is clear that the ALJ's construction

- 14 -

is not an express statement of the *Stone* standard.  The ALJ committed *Stone* error because the severity standard he applied at step two was not an express statement of the *Stone* standard and he did not explicitly reference that standard by citing *Stone* or a similar opinion, as is required by *Stone*. *See Stone*, 752 F.2d at 1106; (R. at 21).

### 2. Consequence of *Stone* Error

The Commissioner argues that *Stone* does not apply when the ALJ proceeds past step two of the disability analysis, and argues alternatively that any *Stone* error was harmless because Plaintiff has not identified any impairment that was erroneously dismissed as non-severe on the basis of such error.  (D. Br. at 5-6.)  Plaintiff responds that the *Stone* error was not harmless because the ALJ improperly dismissed as non-severe, based on an incorrect severity standard,  his "migraines, sleep apnea, explosive disorder, [and] chronic pain."  (Pl. Reply Br. at 4.)  He further argues there was harm because the ALJ "did not make it clear" that he considered the dismissed mental impairments, in combination with the other impairments, "throughout the balance of the evaluation." (*Id.*)

In *Jones v. Astrue*, 821 F. Supp. 2d 842, 849 (N.D. Tex. 2011) (Toliver, M.J.), the court noted that while this district had routinely reversed and remanded cases where the ALJ committed *Stone* error, the Commissioner for the first time had "squarely presented and adequately briefed" the argument that *Stone* error is harmless if the ALJ continues beyond step two of the disability analysis. In deciding the issue, the court focused on the language in *Stone* that "[i]n view of ... [its] recent experience with cases where the *disposition has been on the basis of nonseverity*," the Fifth Circuit would "in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement" and mandate reversal.  *Id.* (citing *Stone*, 752 F.2d at 1106) (emphasis

in *Jones*).  It also examined post-*Stone* cases where the Fifth Circuit found that reversal on *Stone* error was not required if the ALJ had proceeded past step two of the disability analysis.  *Id.* (citations omitted).  The court concluded that *Stone* error was not grounds for reversal where the ALJ "proceeded beyond step two ... in discussing all of [the claimant's] impairments."  *Id.* at 851.

Noting the *Jones* decision, the court in *Jones v. Astrue*, 851 F. Supp. 2d 1010, 1018 (N.D. Tex. 2012) (McBryde, J.), subsequently also concluded that *Stone* error was not grounds for automatic reversal and remand.  It likewise closely examined *Stone* as well as post-*Stone* cases where the Fifth Circuit held "that an error in the [ALJ's] analysis at step two does not require a remand when the ALJ has gone beyond the second step."  *Id.* at 1016-17 (citing *Harrell v. Bowen*, 862 F.2d 471 (5th Cir. 1988) (per curiam).  It also examined a Fifth Circuit case finding "no error similar to that found in *Stone*" because the ALJ applied an incorrect severity standard but proceeded to consider the effects of the claimant's disputed impairment on his ability to work at steps four and five, and did not deny benefits "prematurely ... based on [that] improper determination of 'non-severity.'" *Id.* (citing to *Jones v. Bowen*, 829 F.2d 524, 526 n.1 (5th Cir. 1987) (per curiam)).  Based on its analysis, the court found that *Stone* did not create an exception to established harmless-error policy in the Fifth Circuit, which is to "preserv[e] a decision under review to avoid waste of time unless the error had an adverse effect on the substantial rights of a party", and that application of harmless-error analysis to *Stone* error cases where the ALJ proceeded past step two is consistent with Fifth Circuit law.  *Id.* at 1016-18.

These well-reasoned cases compel reconsideration of prior holdings that *Stone* error mandates remand.  The Fifth Circuit has explained that "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, *without consideration of the remaining steps in*

*the sequential analysis*, claims of those whose impairment is more than a slight abnormality." *Anthony v. Sullivan*, 954 F.2d 289, 294 (5th Cir. 1992) (emphasis added).  This Court now joins the *Jones* courts in finding that *Stone* error is not grounds for automatic reversal and remand if the ALJ continues beyond step two of the disability analysis, and that application of the harmless-error analysis is to those cases is appropriate.

### 3.    Harmless Error Analysis

In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, the ALJ determined at step two that in addition to a number of severe physical impairments, Plaintiff had the following severe mental impairments: obstructive sleep apnea, mood disorder with depressive features, and bipolar disorder.  (R. at 22.)  He next determined that Plaintiff had the RFC to perform light work with several physical and mental limitations.  (R. at 28.)  In assessing Plaintiff's RFC, the ALJ stated that he had considered "all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)  Consideration of all "medically determinable impairments ... including [those] that are not 'severe'" is required by the regulations when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2).  Although the ALJ considered the effects of all of Plaintiff's alleged impairments on his ability to work, including his migraines, sleep apnea, mood disorder due to chronic pain, and anger issues, he explicitly discounted Plaintiff's statements about the severity of his mental impairments as not fully supported by the objective medical evidence and by the medical consultants' RFC assessments.  (*See* R. at 30-31.)  The ALJ

then proceeded to steps four and five and concluded that considering Plaintiff's age, education, work experience and RFC, he could not return to his past work but could perform other jobs existing in significant numbers in the national economy. (R. at 32.)

The ALJ considered the effects of all of Plaintiff's mental impairments, combined with the effects of his physical impairments, and concluded that he had the RFC to perform substantial gainful activity.  (R. at 28-32.)  Although he did not find that Plaintiff's migraines, mood disorder due to chronic pain, and anger issues were severe impairments, he still considered their effects on his ability to work as required by the regulations.  The *Stone* error was harmless because it is inconceivable that the ALJ would have reached a different conclusion if he had applied the *Stone* severity standard at step two.  Remand is therefore not required on this issue.

D.     **Treating Psychologist's Opinion**

Plaintiff next contends that the ALJ erred by referencing only the evidence that supported his disability decision, and by failing to address Dr. Thiruvengadam's treating opinion and RFC assessment under the six factor analysis found in 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). (Pl. Br. at 1, 12.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1529(b).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).[3]  A treating source is a claimant's "physician,

---

[3]  The parties' briefs cite to the regulations in effect in 2011.  Although the recent amendments to the regulations are cited in this recommendation, the amendments do not impact the analysis or the outcome of the issues in this case.

psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir.2000). If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's

views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ determined that Plaintiff had the RFC to perform light work that did not involve standing or walking for more than two hours in an eight-hour workday. (R. at 28.) He determined that Plaintiff could perform simple job tasks that involved occasional or incidental contact with others. (*Id.*) He stated that he had based his findings on the credible medical, testimonial, and documentary evidence in the record. (R. at 22-32.) The ALJ "considered" the opinion evidence submitted by Dr. Thiruvengadam, Plaintiff's treating psychiatrist, but concluded that his opinions were not supported by "his own clinical observations or by the consultative psychological examination" performed by Dr. Lilly. (R. at 32, 288-92.) Noting inconsistencies between Dr. Thiruvengadam's initial psychiatric evaluation and his RFC assessment, the ALJ decided not to give his opinions controlling weight. (*Id.*)

For example, in his initial psychiatric evaluation, Dr. Thiruvengadam opined that Plaintiff was calm, cooperative, and pleasant; that his thought processes were logical, clear, and goal oriented; that his thought content was abstract and concrete; and that he had good insight and judgment. (R. at 409-10.) In his RFC assessment, which he performed on the same day as his psychiatric evaluation, Dr. Thiruvengadam opined that Plaintiff had no useful ability to function in 14 mental aptitudes, including understanding, remembering, and carrying out very short and simple

instructions and remembering work-like procedures.  (R. at 444-45.)  He opined that Plaintiff had

no useful ability to interact appropriately with the general public, or to maintain socially appropriate

behavior.  (R. at 445.)  He concluded that Plaintiff's overall prognosis was "poor," that he would

likely miss more than four days of work per month due to his mental impairments, and that these

impairments could be expected to last at least twelve months.  (R. at 442, 447.)  Because he noted

that Dr. Thiruvengadam's opinions in his RFC assessment and his psychiatric evaluation were in

conflict, the ALJ was free to give them little or no weight.

Evidence from other physicians, including treating and examining physicians, also

contradicted Dr. Thiruvengadam's opinions that Plaintiff had no useful ability to function in several

mental aptitudes and that he had no useful ability to interact appropriately with others or to maintain

socially appropriate behavior.  On June 6, 2009, Dr. Lilly, an examining physician, found that

Plaintiff's attention and concentration were normal and "intact," that he had mild impairments with

his memory, insight and judgment, and that he had a severe impairment with his abstract thinking.

(R. at 291.)  She noted that his behavior was "controlled and appropriate" throughout the evaluation.

(*Id.*)  When questioned about his ability to complete tasks, Plaintiff responded that it was "[p]retty

good."  (*Id.*)  Plaintiff also stated that he was "listening to [his] doctors, not missing [his]

appointments, and trying to get back to normal."  (R. at 25, 292.).

On July 23, 2009, Dr. Meyer, a non-treating, non-examining physician, reviewed Plaintiff's

medical evidence and concluded that he was "not significantly limited" in nine categories, that he

was "moderately limited" in eleven categories, and that he was "able to understand, remember, and

carry out detailed but non-complex instructions ... attend and concentrate for extended periods,

interact with others, accept instructions and respond to changes in a work settings [*sic*]."  (R. at 296-

298.)  On June 8, 2010, clinician Brooks, a treating physician, noted that Plaintiff's anger was not a constant issue, that he showed no signs of self mutilation, and that he had no suicidal or homicidal ideations at that time.  (R. at 434.)

The ALJ noted that while Plaintiff alleged to have suffered from anger problems all his life, he did not seek psychological treatment until May 2010.  (R. at 31); (*see also* R. at 452.)  He concluded that because Plaintiff was motivated to continue with his treatment, his anger problem would improve.  (R. at 31.)  The ALJ was free to reject Dr. Thiruvengadam's opinions regarding Plaintiff's mental impairments because the evidence supported contrary conclusions.  It was also proper for the ALJ to give greater weight to Dr. Meyer's opinions than to Dr. Thiruvengadam's opinions because an ALJ may accept a well-supported non-examining physician's opinion over a treating physician's opinion.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981); (R. at 31).  The ALJ was not required to analyze Dr. Thiruvengadam's opinions using the factors listed in 20 C.F.R. § 404.1527(c)(1)-(6) because there was competing first-hand medical evidence, and because he found that Dr. Lilly's and Dr. Meyer's opinions were better founded.  *See Newton*, 209 F.3d at 458.  The ALJ's decision to give little weight to Dr. Thiruvengadam's opinions was not erroneous and is supported by substantial evidence in the record.  Remand is therefore not required on this issue.

## III.   RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED**, Defendant's motion for summary judgment should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED, on this 10th day of September, 2012.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE